# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1559

_____

Craftsmen Limousine, Inc.; JMRL   \*
Sales & Service, doing business as   \*
Craftsmen Limousine, Inc., a Missouri   \*
corporation,   \*
  \*
    Plaintiffs-Appellants,   \*
  \*   Appeal from the United States
   v.   \*   District Court for the Western
  \*   District of Missouri.
Ford Motor Company, a Delaware   \*
corporation,   \*
  \*
    Defendant-Appellee,   \*
  \*
General Motors Corporation, a   \*
Missouri corporation; Cadillac, a   \*
division or affiliate of General Motors   \*
Corporation; LIMO, an association of   \*
limousine builders; AHA Automotive   \*
Design, a Canadian corporation,   \*
  \*
    Defendants,   \*
  \*
American Custom Coachworks,   \*
a California corporation,   \*
  \*
    Defendant-Appellee   \*
  \*
Classic Limousine & Armouring,   \*
a California corporation; DaBryan   \*
Coach Builders, a Missouri   \*
corporation; Eagle Coach, an Ohio   \*

corporation; Executive Coachbuilders, *
a Missouri corporation; Federal Coach, *
an Arkansas corporation; Image *
Coaches, an Indiana corporation; *
International Armor & Limousine, an *
Illinois corporation; Krystal Koach, a *
California corporation; LCW, a Texas *
corporation; Picasso Coach Builder, a *
New York corporation; Royale *
Limousine Manufacturers, a *
Massachusetts corporation; R-D Group, *
a California corporation, doing *
business as Tiffany Coachworks; *
Accubuilt, Inc., an Ohio corporation, *
formerly known as S&S/Superior of *
Ohio; Tri-State Custom Coach, a New *
Jersey corporation; United States *
Coachworks, a New York corporation; *
Viking Coachworks, a Florida *
corporation, *
  *
    Defendants. *

_____

Submitted: January 11, 2007
Filed: June 19, 2007

_____

Before WOLLMAN and MELLOY, Circuit Judges, and NANGLE,[1] District Judge.

_____

MELLOY, Circuit Judge.

---

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

-2-

Plaintiff Craftsmen Limousine, Inc. ("Craftsmen") brought an antitrust claim against vehicle manufacturers Ford Motor Company ("Ford") and the General Motors Corporation ("GM"), the Limousine Industry Manufacturers' Organization ("LIMO"), and numerous coachbuilding companies engaged in the business of stretching Ford and GM vehicles into limousines. Over the course of the lawsuit, Craftsmen reached settlements with and/or voluntarily dismissed all defendants except Ford and American Custom Coachworks ("American Coach"), one of the coachbuilding companies. In an initial trial, the district court found that an alleged conspiracy between Ford and American Coach to influence the advertising and trade-show policies of two trade publications constituted a per se antitrust violation, and the jury returned a verdict for Craftsmen.

Ford appealed to this court, and we reversed the judgment. Craftsmen Limousine, Inc. v. Ford Motor Co. ("Craftsmen I"), 363 F.3d 761 (8th Cir. 2004). We held that the district court erred in applying a per se rule to the alleged antitrust violation; it instead should have applied the rule of reason. We remanded the case and instructed the district court to apply the rule of reason to Craftsmen's antitrust claim.

After further discovery, the district court[2] granted Ford's motion to exclude Craftsmen's expert witness under Federal Rule of Evidence 702 and granted the motions of Ford and American Coach for summary judgment in their favor. Craftsmen now appeals those decisions. We affirm.

---

[2]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

# I. BACKGROUND

### A. Pre-Litigation Background

The factual background is fairly extensive, and we presented it at length in our first opinion in this case. Craftsmen I, 363 F.3d at 764-71. We will not reiterate it in full here, but we discuss those facts necessary to understand the nature of the claim at issue. Because the district court granted the defendants' motion for summary judgment in this case, we present the facts in the light most favorable to Craftsmen. Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 343 (8th Cir. 1995).

Craftsmen is a Missouri corporation engaged in the business of stretching standard base vehicles into limousines and buses. This process involves cutting the base vehicle in two, inserting structural pieces between the two halves of the base vehicle, and welding the parts back together to create a "stretched" limousine. In general, longer structural inserts (and, accordingly, longer stretched limousines) add weight and create greater stress upon the vehicle frame. Craftsmen, however, asserts that its specialized rebuilding process allows for the conversion of base vehicles, including the Ford-manufactured Lincoln Town Car, into very long limousines without sacrificing safety.

The National Highway Traffic Safety Administration requires coachbuilders to self-certify that their limousines meet federal safety standards and to provide some objective basis for that belief. Federal authorities began investigating the safety of limousines following a well-publicized crash and other incidents in the late 1980s. Ford sought to protect its image and, at the same time, to increase its share of the market for base vehicles. In 1990, while Craftsmen was actively engaged in the business of building stretched limousines, Ford formed a vehicle certification program that provided guidelines for the conversion of its vehicles into limousines that met national safety standards. Ford would certify a participant in the program as a

"Quality Vehicle Modifier" ("QVM") if it abided by Ford guidelines for converting limousines and purchased insurance naming Ford as the insured. The guidelines limited the conversion options of coachbuilders. Among Ford products, coachbuilders could only convert Lincoln Town Cars, and there were limits upon the total weight of the resulting limousines and the length to which they could be stretched (no more than 120 additional inches). Coachbuilders that followed the guidelines gained some assurance that their vehicles met federal standard standards, and they received cash incentives from Ford for their participation in the QVM program. GM adopted a similar but separate program in 1992, the Cadillac Master Coachbuilders ("CMC") program. Coachbuilders who wished to stretch a vehicle in a manner that did not conform to QVM guidelines could retain QVM membership only if they submitted independent test data regarding vehicle safety to Ford. Most coachbuilders, including all of the original defendants in this case, participated in one or both of the QVM and CMC programs.

Craftsmen was one of a minority of American coachbuilding companies that chose not to participate in either program. Many of Craftsmen's conversions at the time resulted in vehicles longer than the limits imposed by the QVM and CMC programs (hereinafter "specialty limousines"), and joining the QVM program would have required Craftsmen to abandon its practice of building specialty limousines or to seek costly independent safety analysis. In addition, Craftsmen was already using techniques described in the QVM guidelines, and Craftsmen's owners had no reason to believe that the company's converted vehicles were unsafe. A federal inspection of its converted vehicles in the early 1990s resulted only in some minor, federally-mandated safety modifications.

Ford was also a nonvoting member of LIMO, an industry group of coachbuilders that formed in 1989 to pool resources for product testing and to promote consumer confidence in limousines. American Coach was a voting member. Among coachbuilders, LIMO membership was open only to those businesses who

participated in the QVM and/or CMC programs; eventually, LIMO amended its bylaws to allow non-participating coachbuilders to join if they submitted independent crash-test data. Craftsmen did not join either program or perform independent crash tests, and therefore it was ineligible to become a member of LIMO.

Ford, American Coach, and other LIMO members soon began to act through the organization to exert influence over marketing outlets in the limousine industry. In 1995, LIMO received a commitment from one trade publication to remove all non-QVM and non-CMC advertisers and to deny non-QVM and non-CMC coachbuilders access to its trade show. In a 1996 LIMO teleconference, its members unanimously agreed that they would "not endorse or participate in any publication which continues to promote non-CMC/QVM limousine manufacturers" or "any limousine trade show which promotes the interests of non-CMC/QVM products." By 1996, both of the major trade publications in the limousine industry had adopted restrictive policies that barred coachbuilders that did not participate in the QVM or CMC programs from placing advertisements unless they submitted independent crash-test data to prove that their vehicles complied with federal safety standards. Non-participating coachbuilders also faced restrictions upon their participation in the publications' annual trade shows. In the face of these limitations, Craftsmen's business suffered. It found creative ways to market its company name, such as promoting its ability to customize buses and stretch sport-utility vehicles (neither of these services were subject to advertising restrictions). Craftsmen also maintained a company Web site for marketing purposes, and Craftsmen was able to remain profitable in 1995 and 1996. In 1997—the first year since at least 1991 in which Craftsmen did not turn a profit— Craftsmen began to advertise in a new trade publication that did not require proof of certification or QVM/CMC participation. Craftsmen's expert concedes that, by some point in 1998, any adverse impact of the advertising ban upon Craftsmen's business had evaporated. The same year, Craftsmen filed suit against Ford, American Coach, and several other defendants in the United States District Court for the Western District of Missouri. Craftsmen alleged, *inter alia*, that the defendants engaged in a conspiracy in restraint

of trade in violation of federal antitrust law, 15 U.S.C. § 1, and that this conspiracy harmed Craftsmen's business from 1995 to 1998.

B.  Trial, First Appeal, and Craftsmen I

Craftsmen's claims against Ford and American Coach proceeded to a jury trial in 2002.  The jury returned a verdict of favor of Craftsmen for more than $2 million in damages, which the district court tripled pursuant to 15 U.S.C. § 15(a).  Ford and American Coach appealed to this court, arguing that the evidence was insufficient to establish a conspiracy among them, Craftsmen I, 363 F.3d at 771, and that the district court erred in finding that the alleged restraint of trade constituted a per se antitrust violation.  Id. at 772.  We disagreed with the first contention and held that Craftsmen submitted evidence sufficient for a reasonable jury to conclude that Ford and American Coach acted through LIMO to exclude Craftsmen and other specialty coachbuilders from advertising in trade publications and participating in trade shows. Id.

We agreed with Ford and American Coach, however, that these actions did not amount to a per se violation of antitrust law.  Id. at 772-76.  We came to this conclusion because restrictions upon coachbuilders that had not submitted particular evidence that their products met certain safety standards are not necessarily anti-competitive: "[T]he creation and enforcement of standards, including safety standards, often has pro-competitive effects.  For example, having unsafe limousines in the market could tend to undercut consumer confidence in all limousines, and thereby decrease overall limousine sales."  Id. at 774.  In short, we found that "the economic impact of safety standards is not immediately discernable."  Id.  Therefore, the case demanded a more thorough analysis than the abbreviated one employed by the district court to determine whether the restraint was unreasonable.  Id.

We held that the district court should have instead applied the rule of reason to determine whether the actions of Ford and American Coach unreasonably restrained trade in the industry. Id. at 776. Under the rule of reason, the factfinder probes more deeply into the relevant circumstances to determine whether the actions at issue created an unreasonable restraint on competition. Id. at 772-73. Because this question was never posed to the jury, we remanded the case to the district court. Id. at 777. We also ruled that the testimony of Craftsmen's expert, David Cole, was inadmissible insofar as it purported to prove an antitrust violation or measure damages arising out of assumed anticompetitive conduct. Id. While Cole was qualified and provided expert testimony with regard to Craftsmen's damages, his testimony was not helpful to a jury in a rule-of-reason case because he "*assumed* that Craftsmen's alleged lost growth from 1995 through 1998 was caused by [the] defendants' alleged conspiracy. He did not determine whether other factors . . . may have affected Craftsmen's growth rate. Under the rule of reason analysis, which should have been applied in this case, such an analysis was required." Id.

C. Post-Remand Proceedings

Upon its return to the district court, Craftsmen retained economist John Scoggins to perform expert analysis consistent with our opinion in Craftsmen I. To carry out this task, Scoggins used statistical models to show what the demand for Craftsmen limousines should have been during the years at issue and noted that the actual demand was significantly smaller. He identified several variables that could have caused the reduced demand, such as the national economy or competition from other coachbuilders. After running regressions to determine the impact of these variables, he found that none could account for Craftsmen's disappointing sales figures from 1995 to 1998. Therefore, by process of elimination, he concluded that the advertising and trade-show restrictions must have been the primary cause of the dampened demand for Craftsmen's services during that period. Through the use of

a dummy variable to gauge this impact, he was able to estimate the total amount of sales that Craftsmen lost as a result of the restrictions.

Craftsmen merely asked Scoggins to analyze the impact of the behavior of Ford and American Coach upon Craftsmen's net income from 1995 to 1998, and to specifically look into alternative causes for disappointing sales for Craftsmen during the years in question. He performed that task, and went no further. He did not explore whether the restraints had or could have an anti-competitive impact upon the limousine industry as a whole. He did, however, undertake some research into the limousine industry as a whole insofar as it related to Craftsmen's damages, and he found that the number of competitors in the industry had not changed significantly over a thirteen-year period. He also acquired limited, anecdotal evidence of the adverse impact of the advertising and trade-show restrictions upon the sales figures of one other specialty limousine manufacturer during the same time period.

Ford moved to exclude Scoggins's testimony under Federal Rule of Evidence 702, and both Ford and American Coach moved for summary judgment. The district court granted the motions. It concluded that Scoggins's opinion would not "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, because Scoggins did not analyze whether the restraints at issue were anti-competitive under the rule of reason; he merely analyzed their effect upon Craftsmen. Further, the district court took issue with Scoggins's definition of the relevant market. Scoggins claimed that he analyzed the effects of the allegedly anti-competitive behavior upon the "specialty limousine market"—that is, a market for limousines stretched beyond QVM and CMC limits. He acknowledged that QVM- and CMC-compliant limousines and specialty limousines are substitute products and manufacturers of each type "do compete at some level," but he asserted that they are not "close substitutes." Scoggins offered no empirical support for this market definition. Therefore, the district court found his testimony inadmissible under Rule 702.

The district court also noted that Craftsmen's opposition to summary judgment depended upon the admissibility of Scoggins's testimony. It therefore granted the motions of Ford and American Coach for summary judgment in the case.

## II. DISCUSSION

Craftsmen appeals, arguing that the district court erred in excluding Scoggins's opinion under Rule 702 and in granting summary judgment in favor of Ford and American Coach. The issues are closely related, and we need not address them both. The reasons for the district court's determination that Scoggins's opinion would not assist the trier of fact, if valid, would be the same reasons that his opinion cannot save Craftsmen from an adverse summary judgment ruling in this case. Therefore, we review the question of whether summary judgment was appropriate in light of the record as a whole, including Scoggins's opinion.

### A. General Principles of Law

We review a grant of summary judgment de novo, viewing the record in the light most favorable to the non-movant. Bathke, 64 F.3d at 343. Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To avoid summary judgment, a non-moving party must allege specific facts supported by evidence sufficient to allow a reasonable jury to return a verdict in its favor; a mere "scintilla of evidence" will not suffice. Rolscreen Co. v. Pella Prods. of St. Louis, Inc., 64 F.3d 1202, 1211 (8th Cir. 1995).

The Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has long accepted that Congress did not intend a literal interpretation of that language, and it has read the law as prohibiting only those practices that "impose[] an unreasonable

restraint on competition." Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 342-43 (1982). The burden of proving the unreasonableness of a restraint lies with the plaintiff. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 374 n.5 (1967), *overruled on other grounds by* Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59 (1977); Paschall v. Kansas City Star Co., 727 F.2d 692, 701-02 (8th Cir. 1984); United States v. Empire Gas Corp., 537 F.2d 296, 308 (8th Cir. 1976).

Some antitrust plaintiffs face a lighter burden than others, depending upon the nature of the restraint at issue. Plaintiffs challenging restraints subject to the "per se rule" enjoy the lightest burden of proving unreasonableness. Judicial experience has proven certain types of restraints to be so strongly linked with anti-competitive activity, and their economic impact so immediately obvious, that we presume unreasonableness and deem them unlawful restraints of trade per se. State Oil Co. v. Khan, 522 U.S. 3, 10 (1997); Nat'l Collegiate Athletic Ass'n v. Bd. of Regents, 468 U.S. 85, 100 (1984). When challenging such naked restraints, the plaintiff meets its burden of proving the unreasonableness of the restraint merely by proving the existence and substance of the restraint itself. See Nat'l Soc. of Prof. Eng'rs v. United States, 435 U.S. 679, 692 (1978) ("In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se*.'"). The district court applied this approach to the advertising restrictions at issue here prior to our opinion in Craftsmen I.

In a limited number of other cases, the restraint appears pernicious enough on its face to fall within the category of restraints that are unlawful per se, but judicial inexperience with the particular type of restraint warrants a "quick look" at the relevant market and the defendant's alleged justifications for imposing the restraint. Craftsmen I, 363 F.3d at 773; see also Calif. Dental Ass'n v. FTC, 526 U.S. 756, 769-71 (1999) (acknowledging the existence of the "quick look" mode of analysis). This

amounts to an abbreviated analysis of whether the restraint was unreasonable (though not as abbreviated as an outright condemnation of the restraint as unlawful per se).

These two standards are exceptional, however, and their application is reserved for the most patently anticompetitive restraints. Given the danger of applying those truncated modes of analysis too freely, State Oil Co., 522 U.S. at 18, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." Id. at 10.

Due to the number of variables involved, including the type of restraint, the nature of the market at issue, and the level of judicial experience with a particular type of restraint in any given case, determining which mode of analysis is appropriate rarely allows for the mechanical application of precedent:

> [T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an [appropriate inquiry given the facts of] the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.

Calif. Dental Ass'n, 526 U.S. at 780-81.

B.  The Scope of Craftsmen I

In Craftsmen I, we held that the district court erred in applying a per se mode of analysis to the restraint at issue in this case.  We noted that the restraint appeared to be an attempt to alter the competitive field in the limousine industry:  "[i]n essence, defendants' alleged restraint was an attempt to force Craftsmen to either comply with QVM guidelines or stop selling limousines."  Craftsmen I, 363 F.3d at 774.  We also found, however, that the defendants' plausible safety justifications for pursuing the restrictive advertising standards could have procompetitive effects and therefore an abbreviated analysis of its anticompetitive impact was inappropriate.  Id. at 776.  This decision followed a line of recent Supreme Court precedent holding either the per se or "quick look" modes of analysis improper when the alleged substance of the restraint and any purported justifications for it did not create the obvious impression that the restraint would be unreasonably anticompetitive.  See, e.g., Calif. Dental Ass'n, 526 U.S. at 781; State Oil Co., 522 U.S. at 19, 21-22.  Under that reasoning, we held in Craftsmen I that the experience of the market and the type of restraint at issue in this case were not so clearly anticompetitive that the district court could properly substitute an abbreviated analysis "in place of a more sedulous one."  Calif. Dental Ass'n, 526 U.S. at 781.

Therefore, on remand, Craftsmen had the burden of proving the unreasonableness of the restraint given "a variety of factors" under the rule of reason, State Oil Co., 522 U.S. at 10; it would not enjoy a presumption of unreasonableness based solely upon the existence of the restraint itself.  This burden begins with the task of properly defining the relevant market.  Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998).  The plaintiff must define both the relevant product market, which includes "all reasonably interchangeable products," and the relevant geographic market, which consists of the "area in which consumers can practically seek alternative sources of the product."  Id.  After properly defining the market, the rule of reason also requires the plaintiff to show that the restraint has

"detrimental effects" upon the competitiveness of the market. <u>FTC v. Ind. Fed'n of Dentists</u>, 476 U.S. 447, 460-61 (1986) (quotation omitted).

A plaintiff may satisfy the "detrimental effects" element of its burden in one of two ways. First, a plaintiff may put forth evidence of "actual, sustained adverse effects on competition" in the relevant market. <u>Id.</u> at 461. If the plaintiff cannot submit such evidence, it is relegated to the more challenging course of proving detrimental effects on competition by making "an inquiry into market power and market structure designed to assess the [restraint]'s actual effect." <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 768 (1984). A defendant or cartel of defendants has market power if it has the ability "'to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded.'" <u>Midwestern Mach. Co. v. Nw. Airlines, Inc.</u>, 392 F.3d 265, 274 (8th Cir. 2004) (quoting William A. Landes & Richard A. Posner, <u>Market Power in Antitrust Cases</u>, 94 Harv. L. Rev. 937, 937 (1981)).

Only after satisfying the above requirements does the burden shift to the defendant to "justify its conduct by reference to rational, procompetitive economic principles." <u>Flegel v. Christian Hosp., Ne.-Nw.</u>, 4 F.3d 682, 688 & n.4 (8th Cir. 1993) (quotation omitted). If the defendant can do so, the burden returns to the plaintiff to show that the defendant can achieve the same rational, procompetitive ends through means less likely to harm overall competition in the market. <u>Id.</u> at 688. If so, the court will ultimately balance "'the harms and benefits to determine if the behavior is reasonable'" on the whole. <u>Id.</u> (quoting <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1413 (9th Cir. 1991)).

Contrary to Craftsmen's assertions on the present appeal, none of the elements of this burden were addressed or decided in <u>Craftsmen I</u>. Indeed, we could not have decided them, because Craftsmen's case had never gone before a factfinder charged with deciding the dispute under the rule of reason approach. <u>Craftsmen I</u> did discuss

-14-

the procompetitive justifications of Ford and American Coach, but only insofar as they related to the question of which analysis to apply to the case: per se, "quick look," or rule of reason. We did not purport to actually apply the proper approach (the rule of reason), and we did not address the procompetitive justifications in that context.

### C. The Propriety of Summary Judgment on Remand

For the following reasons, we hold that Craftsmen failed to produce evidence sufficient to allow a reasonable jury to conclude that it satisfied its burden of proof as defined above. Therefore, the district court did not err in granting summary judgment to Ford and American Coach.

#### 1. Market Definition

The parties do not appear to dispute the relevant geographic market in this case, but they contest the relevant product market. Ford and American Coach claim that the relevant product market consists of the market for limousines generally, while Craftsmen argues for the existence and relevance of a smaller sub-market for longer specialty limousines. The district court found Craftsmen's definition unavailing, and so do we. Craftsmen's attempt to define the relevant product market as the "specialty limousine market" lacks any evidentiary support aside from Scoggins's bald assertions and is inconsistent with Craftsmen's overall claim. As such, no reasonable juror could find that the specialty limousine market is the relevant product market for this antitrust claim.

Craftsmen defines the specialty limousine market as the market for limousines stretched longer than QVM standards (120 inches) or CMC standards (130 inches) during the time frame at issue. Under that definition, a Lincoln Town Car stretched by 85 inches competes in the same product market as one stretched by 120 inches, while a Town Car stretched by 120 inches competes in a separate market from one

stretched by 121 inches. Further, a Town Car stretched by 85 inches would compete in the same market as a Cadillac DeVille stretched by 130 inches, while a Town Car stretched by 125 inches would compete in a separate market than a DeVille stretched by the exact same length. Any reasonable juror would find it implausible that consumers would make such arbitrary and illogical distinctions when buying limousines, and Craftsmen presented no evidence that consumers act in such a manner. Put simply, no reasonable juror could find that Town Cars stretched by 120 and 121 inches, respectively, were not "reasonably interchangeable products," Double D Spotting Serv., Inc., 136 F.3d at 560, particularly given that Craftsmen maintains that Town Cars stretched by 120 and 85 inches are reasonably interchangeable.

Even if Craftsmen had sufficient evidence to support such an apparently arbitrary definition of the product market, we note that it would ultimately undermine Craftsmen's claim. The restrictions at issue arguably aided QVM and CMC members to the general detriment of Craftsmen and all other specialty limousine builders. Assuming those facts to be true, the restrictions certainly harmed some of the *competitors* within the specialty limousine market. There is no evidence, however, that the restrictions harmed *competition* within that market. See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) (stating that, when the rule of reason applies, a plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"). From the record, it does not appear that the restrictions gave any particular competitor or cartel of competitors within the specialty limousine industry the power to profitably raise prices above or restrict output below a competitive level. To the extent they did, Craftsmen was a likely beneficiary of any anti-competitive environment within the specialty limousine industry; the restrictions may have discouraged upstart coachbuilders from engaging in the process of building specialty limousines and clearly barred QVM and CMC members from serving that allegedly separate market. Thus, the restrictions insulated well-established coachbuilders like Craftsmen from competition in the specialty limousine market. In short, if the restrictions created the risk of an anti-competitive

-16-

environment *within* some discrete market for specialty limousines, that risk did not stand to harm Craftsmen. Indeed, under the market definition Craftsmen proposes, Craftsmen would have been the beneficiary—not the victim—of reduced competition and artificially high prices within that market.

## 2. Detrimental Effects

Even though we hold that no reasonable jury could find that Craftsmen properly defined the market as the "specialty limousine market," Craftsmen contends that it presented sufficient evidence of an antitrust violation to avoid summary judgment regardless of whether the relevant product market is defined as the market for specialty limousines or the market for limousines generally. Therefore, we proceed to examine whether Craftsmen presented evidence sufficient for a jury to find detrimental effects on competition in the correct product market—the market for limousines generally.

We first look to whether Craftsmen submitted evidence of "actual, sustained adverse effects on competition" in the general market for limousines. Ind. Fed'n of Dentists, 476 U.S. at 461. Craftsmen points to no evidence that such effects occurred in the limousine industry as a result of the restrictions. Craftsmen did not show an increase in limousine prices above the competitive level during that time period, nor a decrease in the total number of competitors, nor a reduction in overall limousine output, nor some other economic indicator that the coachbuilding industry as a whole suffered anticompetitive consequences due to the advertising restrictions. The mere fact that the restrictions may have reduced demand for specialty limousines relative to their shorter counterparts does not, without more, show an actual, sustained adverse effect on competition in the market as a whole. Any action that a profit-seeking business takes could increase its market share relative to some other segment of that market; indeed, most rational businesses actively take such steps at every available

opportunity. Such steps impact competitors, but that alone does not prove an adverse impact upon the competitive process.

There may have been other conceivable avenues of proving detrimental effects upon the competitive process in this case. For example, Craftsmen may have been able to show that the restrictions stifled industry research and development by effectively forcing innovative coachbuilders to perform costly independent safety testing of vehicles that did not comply with QVM or CMC guidelines. If Craftsmen offered more than a scintilla of evidence that the restrictions were so detrimental to the survival of non-QVM/CMC participants and independent testing so cost-prohibitive that the defendants created an artificial and illegitimately high barrier to competition by means of innovation, then Craftsmen's case might survive summary judgment. Cf. Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 495-98 (1988) (describing a jury verdict for the plaintiff on facts similar to those hypothesized above); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 659-60 (1961) (per curiam) (reversing the dismissal of the plaintiff's antitrust claim based upon allegations that the defendants refused to offer their seal of approval for the plaintiff's product and effectively forced it from the market for anticompetitive reasons). Craftsmen does not direct our attention to any such evidence, and facts that do appear in the record would not permit a reasonable jury to find that the advertising restraints had "actual, sustained adverse effects on competition" of the type hypothesized above. Ind. Fed'n of Dentists, 476 U.S. at 461.

Because Craftsmen cannot directly prove actual adverse effects on competition during the years at issue, we turn to the question of whether it has presented evidence to prove those effects indirectly through "an inquiry into market power and market structure." Copperweld Corp., 467 U.S. at 768. We find that Craftsmen did not submit evidence sufficient to satisfy its burden of proof under this alternative means of proving the detrimental, anticompetitive effects of the advertising restrictions, and therefore it cannot avoid summary judgment.

-18-

First, it is clear that Ford and American Coach, acting independently, do not wield power in the limousine market; that is, neither one has the ability "to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded." Midwestern Mach. Co., 392 F.3d at 274 (quotation omitted). Ford sells motor vehicles, a tiny percentage of which are converted into limousines (as are a tiny percentage of vehicles sold by other car manufacturers). It does not sell limousines, and therefore it can individually affect the competitiveness of the limousine market only by unilaterally raising the prices of its pre-conversion vehicles or by entering into an agreement to sell a certain line of vehicles solely to a certain coachbuilder, thus making that coachbuilder the exclusive dealer of limousines converted from that particular base vehicle. The common-sense realities of the market show that Ford lacks the ability to profitably take either step. If Ford were to raise the prices of its motor vehicles generally above competitive levels, it would lose sales to competitors in the much larger market for off-the-lot vehicles, as well as the market for base vehicles to be converted into limousines. Ford also lacks the ability to profitably sell an existing line of vehicles exclusively to a particular coachbuilder, even if it made those sales at a price far above the competitive level. According to Scoggins, there were only 2,250 limousine conversions of any vehicle make in the United States in 1994. If Ford were, for example, to make its Lincoln Town Cars unavailable to the public and sell them exclusively to one coachbuilder, the loss in profits from sales to individuals and other businesses would obviously outweigh the marginal profits of making and selling far fewer Town Cars at a higher price. Craftsmen presents no evidence to contradict these apparent realities of the market.

American Coach does compete in the limousine industry, but the record reveals that it by no means dominates that market. It is merely one of many competitors engaged in the business of coachbuilding, and therefore any attempt to unilaterally increase its prices above competitive levels would be thwarted by consumer flight to American Coach's competitors.

Because neither Ford nor American Coach has the ability to wield market power on their own, we must assume that Craftsmen's theory of the case depends upon the concerted actions of Ford, GM, and the members of their QVM and CMC programs, including American Coach. Acting together, these businesses could conceivably exercise market power in the industry. If a broad cartel of QVM and CMC members agreed to collectively raise prices above competitive levels, the action could be profitable due in large part to advertising restrictions that would have made it more difficult for consumers to learn about competitively-priced alternatives to doing business with cartel members. In other words, through price-fixing and cutting off the means for non-members to compete effectively, the cartel could collectively act as a monopoly within the coachbuilding industry.

This theory, if proven, could support a finding of market power and an antitrust violation in this case. On the record before us, however, no reasonable jury could find such market power, particularly given the structure of the limousine market. Craftsmen's only evidence of market power is the fact that Ford, GM, and several QVM and CMC coachbuilders acted collectively through LIMO to pressure trade publications into restricting marketing opportunities for coachbuilders who did not belong to the QVM or CMC programs and did not perform independent crash testing. This proven ability to act collectively to exercise influence over trade publication advertising policies does not demonstrate an ability to act collectively "to raise price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded." Midwestern Mach. Co., 392 F.3d at 274 (quotation omitted). We noted in Craftsmen I that Craftsmen had presented sufficient evidence to prove an agreement among the defendants to set advertising standards; it had not proven that such an agreement was unreasonably anticompetitive. We did not find that the agreement at issue, without more, was sufficient evidence of market power, and we do not make that finding now. We note that demanding certain standards for advertising that exclude some competitors may make the exercise of

-20-

market power more feasible, but such acts do not alone prove the possession of market power.

Craftsmen did not fill this evidentiary void on remand. The record offers no other evidence to show that these coachbuilders formed a cartel with the ability to collectively exercise market power. For example, there is no evidence that these coachbuilders exchanged price or output information or took some other step that would facilitate price-fixing among them. There is also no evidence that the structure of the coachbuilding market would allow for a well-disciplined cartel. Indeed, the record suggests that the market consists of a large number of small coachbuilding firms who engage in individually negotiated sales for customized products, facts that make the detection and punishment of firms that "cheat" on any price-fixing agreement difficult if not impossible. There appear to be low costs to entry into and exit from the market, and the minimum efficient scale within the industry appears to be fairly small; both facts weigh against the sustainability of any anticompetitive cartel because its membership would necessarily consist of a large number of firms who would face new and frequent price competition from upstart firms. For example, a small-scale cartel member selling vehicles to livery operators in St. Louis and Kansas City above the competitive price (per an agreement with the cartel) would be hard-pressed to remain faithful to that agreement if a new, non-cartel firm took advantage of the ease of entry into the limousine market and began marketing directly to those same livery operators through personal visits, phone calls, mailings, or advertisements in sources other than trade shows or the two major trade publications. Multiply this likely scenario many times over for the numerous small-scale firms in the industry, and it becomes clear that the structure of the limousine market during the years at issue in this case made the attainment and exercise of market power nearly impossible.

Finally, even if Craftsmen could show the feasibility of such a cartel that would have market power, Craftsmen has identified no motive for Ford to engage in such a

conspiracy. Ford makes motor vehicles; it does not convert them into limousines. Any anticompetitive agreement among coachbuilders would likely reduce output in the limousine industry and therefore hurt Ford's sales of base vehicles without any apparent benefits to Ford. In sum, Craftsmen simply has not submitted sufficient evidence of the existence of some entity—whether an individual defendant or the defendants acting as a cartel—with the means to exercise market power in the limousine industry.

## III. CONCLUSION

As we noted in <u>Craftsmen I</u>, the advertising restrictions in this case may be legitimately procompetitive insofar as they protect both consumers and the public image of the limousine market generally. <u>Craftsmen I</u>, 363 F.3d at 774-75. Thus, the restrictions could promote consumer confidence in the industry as a whole, as well as avoid a situation in which the entire market for limousines—safe and unsafe alike—would be dampened due to an accident involving a limousine made by a single coachbuilder that did not adequately test the safety of its vehicles.

At the same time, the circumstances surrounding the adoption of the restrictions in this case are somewhat troubling, and we wish to make clear that our decision today does not foreclose plaintiffs from succeeding in antitrust suits for similar restrictions in future cases. LIMO members may very well have had anticompetitive motives in mind when they sought the restrictions at issue here, and those restrictions may have had some detrimental effects upon competition in the limousine industry. Craftsmen simply did not offer proof sufficient for a reasonable jury to make such a finding. Therefore, we affirm the judgment of the district court.

_____