# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-3158/09-1786

_____

Little Rock Cardiology Clinic PA, et al.,  *
                                   *

          Plaintiffs—Appellants,    *

                                   *

     v.                            *

                                   *

Baptist Health; Baptist Medical     *
System HMO, Inc.,              *   Appeals from the United States
                                   *   District Court for the
          Defendants—Appellees,   *   Eastern District of Arkansas.
                                   *

Arkansas Blue Cross and Blue Shield;  *
USAble Corporation;           *
HMO Partners, Inc.,           *

                                 *

          Defendants.        *

_____

Submitted: September 21, 2009
       Filed:  December 29, 2009 (corrected 1/08/10)

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

This is an antitrust case involving alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. It comes to us after the district court[1] granted Appellee Blue Cross's motion to dismiss for failure to state a claim and denied Baptist Health's motion to tax discovery-related copying costs. The principal issue on appeal concerns the proper methodology for determining the relevant market in an antitrust case. We also address whether the district court abused its discretion in declining to tax costs. We affirm on both issues.

## I. Background

Appellant Little Rock Cardiology Clinic PA ("LRCC") is a professional association of cardiologists located in Little Rock, Arkansas, practicing in both diagnostic and interventional cardiology procedures. Baptist Health is the largest hospital company in Arkansas, operating five hospitals in the state, its largest being a 585-bed facility in Little Rock. Blue Cross & Blue Shield of Arkansas ("Blue Cross") is a health-insurance company headquartered in Little Rock.[2] Beginning in 1975, LRCC and its cardiologists maintained clinical and staff privileges at Baptist Health and were in Blue Cross's FirstSource network, a network of preferred providers used by all of Blue Cross's health plans. This changed, however, with the opening of the Arkansas Heart Hospital.

In 1997, LRCC developed Arkansas Heart Hospital, which specializes in cardiology services and competes with Baptist Health. Prior to developing Arkansas Heart, the LRCC cardiologists were on staff at Baptist Health, and participated in Blue Cross's FirstSource network. Shortly after LRCC opened Arkansas Heart, Blue Cross

---

[1] The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

[2] Prior to oral argument, LRCC and Blue Cross settled their dispute. Blue Cross is no longer a party to this appeal.

terminated its network provider agreements with LRCC and LRCC's doctors. LRCC alleges that Baptist Health effected this termination "in concert and in combination with . . . Baptist Health to restrain and monopolize trade unlawfully, specifically, to protect Baptist Health from competition in the relevant market." In 2003, Baptist Health adopted an "Economic Credentialing Policy," which prohibited any doctor from maintaining staff privileges at any Baptist Health facility if that doctor directly or indirectly held an interest in a competing hospital. Recently, an Arkansas state circuit court permanently enjoined enforcement of this policy.

LRCC initially filed this suit against Baptist Health in November 2006, alleging that Baptist Health conspired with Blue Cross to restrain trade in, and monopolize the market for, cardiology services for privately insured patients by: (1) forming a jointly owned HMO, HMO Partners, Inc., with Blue Cross; (2) agreeing with Blue Cross that Baptist Health would be the HMO's exclusive in-network facility; and (3) agreeing with Blue Cross that Blue Cross would remove LRCC from Blue Cross's FirstSource network. A month later, LRCC amended its complaint to add as plaintiffs a number of individual cardiologists and each of their individual professional associations through which they and LRCC provide cardiology services. Baptist Health then moved to dismiss the complaint for failure to state a claim. The district court denied the motion.

In December 2007, LRCC filed a second amended complaint, adding Blue Cross as a defendant, as well as Blue Cross's and Baptist Health's individually owned subsidiaries and their jointly owned subsidiary.[3] All defendants then moved to dismiss the second amended complaint for failure to state a claim. The district court granted this motion on the grounds that, among other things, LRCC's complaint failed to allege a proper relevant market. In doing so, the district court noted that the

---

[3]For the purpose of this opinion, we refer to the parties as "Baptist Health" or "Blue Cross." The identities of the subsidiaries are not material to our decision.

Supreme Court's recent decision in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), had created a higher pleading standard than the standard in <u>Conley v. Gibson</u>, 355 U.S. 41 (1957), the standard upon which the district court had relied in denying Baptist Health's first motion to dismiss. The district court, however, granted LRCC leave to amend its complaint one final time.

In March 2008, LRCC filed a third amended complaint, the complaint at issue in this appeal, alleging six antitrust claims against Baptist Health.[4] Count I alleges, under § 1 of the Sherman Act, that Baptist Health and Blue Cross unlawfully conspired to restrain trade in the market for services to cardiology patients. The remaining counts allege violations of § 2 of the Sherman Act. Counts II and III allege that Baptist Health conspired with Blue Cross to monopolize, and attempted to monopolize, the market for cardiology procedures. Count IV alleges that Baptist Health monopolized the market for cardiology procedures. Counts V and VI allege that Baptist Health conspired with Blue Cross to monopolize, and aided in Blue Cross's attempt to monopolize, the market for private health insurance.

The district court granted Baptist Health's motion to dismiss with prejudice, finding that the alleged relevant market for Counts I–IV was legally flawed and therefore Counts I–IV did not state a plausible antitrust claim. As to Counts V and VI, the district court dismissed LRCC's claims against Baptist Health as barred by the statute of limitations because LRCC failed to allege an overt act in furtherance of the

---

[4] We note that the third amended complaint contains two additional counts, Counts VII and VIII. Count VII alleges that Blue Cross monopolized the insurance market. It does not name Baptist Health, and is not a subject of this appeal. Count VIII seeks injunctive relief, which the district court rejected as barred by laches. LRCC waived any review of this holding by not raising the issue in its appellate brief. <u>Ballard v. Heineman</u>, 548 F.3d 1132, 1136 (8th Cir. 2008). Thus, these counts are immaterial to our analysis.

conspiracy or attempt to monopolize the private insurance market within the four-year limitations period. See 15 U.S.C. § 15b.

After the district court dismissed LRCC's complaint, Baptist Health filed a bill of costs under Federal Rule of Civil Procedure 54(d), seeking discovery-related costs for transcription, in-house copying of documents, scanning documents produced in discovery, and reproduction of Electronically Stored Information ("ESI"). The district court declined to tax those costs against LRCC.

On appeal, we address two issues: (1) whether the district court erred in dismissing Counts I-IV; and (2) whether the district court erred in declining to tax Baptist Health's discovery-related costs. Because LRCC does not raise on appeal the district court's dismissal, on limitations grounds, of Counts V and VI, we do not address it here. See United States v. Azure, 539 F.3d 904, 912 (8th Cir. 2008).

## II. Antitrust Claims

On appeal, we review de novo the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc., 516 F.3d 695, 698 (8th Cir. 2008). This standard requires us to determine whether the complaint "assert[s] facts that affirmatively and plausibly suggest that the pleader has the right he claims . . . rather than facts that are merely consistent with such a right." Stalley v. Catholic Health Initiatives, 509 F.3d 517, 521 (8th Cir. 2007).

The four counts at issue on appeal raise federal antitrust claims under Sections 1 and 2 of the Sherman Antitrust Act. Under that Act, it is unlawful to contract or form a conspiracy "in restraint of trade or commerce among the several States," 15 U.S.C. § 1, or to "monopolize or attempt to monopolize . . . any part of the trade or

commerce among the several States," 15 U.S.C. § 2. The parties agree that LRCC has not alleged a per se violation. LRCC therefore has the burden of alleging a relevant market in order to state a plausible antitrust claim. Double D. Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998). Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition. See FTC v. Freeman Hosp., 69 F.3d 260, 270–71 (8th Cir. 1995). Thus, as we have stated, "Antitrust claims often rise or fall on the definition of the relevant market." Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995). A relevant market consists of both a product market and a geographic market. Id. We proceed by analyzing each of these required components.

## A. Product Market

A court's determination of the limits of a relevant product market requires inquiry into the choices available to consumers. Craftsmen Limousine, Inc. v. Ford Motor Co., 491 F.3d 380, 388 (8th Cir. 2007). The focus is on how "consumers will shift from one product to the other in response to changes in their relative costs." SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1278 (8th Cir. 1981). The relevant product market should include "products that have reasonable interchangeability for the purpose for which they are produced." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). The district court found that Appellant's third amended complaint failed to allege a relevant product market because, among other reasons, the complaint erroneously defined the product market by how consumers pay for cardiology services. We agree.

The parties extensively brief the issue of what LRCC alleges to be the relevant product market. The complaint first states, "The relevant product is those medical services that cardiology patients receive exclusively in a hospital from a cardiologist." It also states, however, that "cardiology services and hospital services are not distinct products for the purposes of antitrust analysis." Finally, it states that the relevant

-6-

product market is "the market for cardiology procedures obtained in hospitals by patients covered by private insurance." Thus, it is unclear whether LRCC is alleging a market in which there is a single, conjoined service—cardiology services obtained in hospitals—or a market in which there are two distinct and complementary services—hospital services and cardiology services. One issue on which the parties agree, however, is that the product market LRCC alleges is limited to patients covered by private insurance. We base our affirmance of the district court's product-market holding on this undisputed limitation.

LRCC proposes a market limited by how consumers pay for cardiology procedures. This theory lacks support in both logic and law. As stated above, the general issue when determining the relevant product market concerns the choices available to consumers. Craftsmen Limousine, 491 F.3d at 388. In this case—an exclusive-dealing case involving shut-out cardiologists—the relevant inquiry is whether there are alternative patients available to the cardiologists. See Campfield v. State Farm Mut. Auto. Ins. Co., 532 F.3d 1111, 1119 (10th Cir. 2008) ("When there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share."); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R. I., 373 F.3d 57, 67 (1st Cir. 2004) ("[T]he concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*."); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 514 (3d Cir. 1998) (stating the "logical assumption that [a pharmacy] considers members of other prescription plans, or uninsured persons, completely interchangeable with [privately insured] members."). Thus, LRCC must look to alternative patients who are able to pay the required fees, not just those who pay using private insurance.

LRCC argues that the product market should be limited to patients using private insurance because private insurance and government insurance—the other primary method of payment—are not reasonably interchangeable. The trouble with this theory

is that it analyzes the issue from the wrong side of the transaction. It may be true that, from the patient's perspective, private insurance and Medicare/Medicaid are not reasonably interchangeable. For a variety of reasons, including age and financial considerations, a person with private insurance may not qualify for these government programs. But this lawsuit is not about the options available to patients, it is about the options available to shut-out cardiologists. LRCC's claims boil down to the allegation that, due to Baptist Health's allegedly unlawful actions, LRCC has access to fewer patients. The relevant question, then, is to whom might the cardiologists at LRCC potentially provide medical service? LRCC's complaint provides the answer: LRCC can provide service to "patients . . . from either a government program such as Medicare or Medicaid, *or* from a private insurer." (emphasis added). Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case.

In reaching this conclusion we do not, as LRCC argues, disregard the well-pleaded allegations in the complaint. LRCC has made no allegation that private insurance is the only method of payment it can accept. Quite the opposite, LRCC's complaint states both that it can and that it does accept payment from sources other than private insurers. Our conclusion does not challenge LRCC's factual allegations, but rather its legal theory, to which we owe no deference. Wiles v. Capitol Indem. Corp., 280 F.3d 868, 870 (8th Cir. 2002). Nor, as LRCC contends, does our decision in F.T.C. v. Tenet Health Care Corp., 186 F.3d 1045 (8th Cir. 1999), endorse LRCC's proposed market. Tenet was a monopolization case brought under § 7 of the Clayton Act, 15 U.S.C. § 18, in which we addressed the bounds of a relevant geographic market. Tenet, 186 F.3d at 1051–52. In so doing, we found only that the locations where a patient with private insurance could reasonably turn (a key inquiry in geographic-market analysis) were constrained by whether the patient's insurance covered the hospital in the relevant location. Id. at 1055. This does not address the

inquiry in the case of a shut-out supplier: to whom can the supplier sell? Thus, Tenet is inapposite to our decision on the relevant product market in this case.

We conclude that, as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller. We also analyze LRCC's alleged relevant geographic market as an alternative ground on which to affirm the district court's dismissal.

## B. Geographic Market

LRCC's failure to allege a coherent relevant geographic market provides an adequate and independent means of affirming the district court's dismissal. Properly defined, a geographic market is a geographic area "in which the seller operates, and to which . . . purchaser[s] can practicably turn for supplies." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); accord Morgenstern v. Wilson, 29 F.3d 1291, 1296 (8th Cir. 1994). Broken down, the test requires a court to first determine whether a plaintiff has alleged a geographic market that includes the area in which a defendant supplier draws a sufficiently large percentage of its business—"the market area in which the seller operates," its trade area. See Morgenstern, 29 F.3d at 1296 (citation omitted); Double D, 136 F.3d at 560; Bathke, 64 F.3d at 345. A court must then determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practicably turn in the event that a defendant supplier's anticompetitive actions result in a price increase. See, e.g., Morgenstern, 29 F.3d at 1296. The end goal in this analysis is to delineate a geographic area where, in the medical setting, "'few' patients leave . . . and 'few' patients enter." United States v. Rockford Mem'l Corp., 717 F. Supp. 1251, 1267 (N.D. Ill. 1989), aff'd, 898 F.2d 1278 (7th Cir. 1990). The district court held that LRCC's alleged geographic market, Little Rock, was overly narrow because the complaint contains no allegations that Little Rock, by itself, made up

Baptist Health's trade area.  As with the product market, we agree with the district court.

LRCC's complaint alleges that Baptist Health operates and competes in an area well beyond the city of Little Rock.  The complaint alleges that Baptist Health serves "a large percentage of residents from around the state who need cardiology services in hospitals."  More specifically, the complaint alleges that, in addition to Little Rock, Baptist Health operates in Hot Springs, Pine Bluff, Conway, Searcy, and El Dorado. Despite these allegations detailing the apparently broad reach of Baptist Health's cardiology services, LRCC's complaint seeks to limit the relevant geographic market to "the cities of Little Rock and North Little Rock."  The geographic market is defined as such, LRCC contends, because cardiology patients in Little Rock and patients from hospitals in surrounding areas "overwhelmingly" go to Little Rock for cardiology procedures.[5]  The reason for this migration to Little Rock, LRCC alleges, is that the cardiology procedures are "not practicably available in hospitals in surrounding cities."  In short, LRCC's argument is that Little Rock is the relevant geographic market because it is the location to which would-be cardiology patients must travel. Accepting the allegations as true and reading them in the light most favorable to LRCC, as we must, Express Scripts, 516 F.3d at 698, we cannot find that LRCC's complaint alleges a plausible relevant geographic market.

This case presents an unusual question.  Our cases typically have addressed disputes raising the issue of where a consumer can practicably turn in the event of a defendant's anticompetitive price increase—the second prong in our two-prong

---

[5] LRCC's complaint alleges that "99.5% of privately insured cardiology patients from the area code with zip codes beginning with the three digits 722, which is Little Rock proper, use hospitals within Little Rock."  Further, "[o]f the privately insured cardiology patients who reside in Little Rock and its surrounding areas, which are covered by zip codes that begin with 722 and 721, 84.7% use hospitals in Little Rock. The remaining 15.3% of cardiology patients in these zip codes use hospitals in North Little Rock and Conway."

geographic-market analysis. See, e.g., Minn. Ass'n of Nurse Anesthetists v. Unity Hosp., 208 F.3d 655, 662 (8th Cir. 2000); Tenet, 186 F.3d at 1054; Double D, 136 F.3d at 560–61; Bathke, 64 F.3d at 344–47; Morgenstern, 29 F.3d at 1296. Here, however, LRCC's complaint contains allegations concerning the geographic areas where customers could turn for cardiology procedures, but fails to do so from the starting point of Baptist Health's trade area. In other words, LRCC's complaint alleges that a low percentage of patients leave its proposed geographic market, but does not allege that a low percentage of its patients enter its proposed geographic market. Without the necessary allegations, we cannot find that LRCC has stated a plausible antitrust claim. By limiting the geographic market in this way, LRCC is able to gerrymander the relevant market to an artificially narrow location, the location where cardiology procedures take place. As the Supreme Court has stated, Tampa, 365 U.S. at 327, and as we have echoed, Double D, 136 F.3d at 560, this is an impermissible limitation. An antitrust plaintiff must allege a geographic market in which the defendant supplier draws a sufficiently large percentage of its business. This crucial first step serves as a limitation, preventing antitrust plaintiffs from delineating arbitrarily narrow geographic markets. It is on this first step that LRCC's complaint stumbles.

Adopting LRCC's theory of a geographic market has the potential to create problems in antitrust cases where the product or service at issue requires the consumer to travel to a specified location. It would, as the district court stated, allow antitrust plaintiffs to "define a market by identifying a small area around the defendant's location in which nearly all potential customers patronize the defendant." Using LRCC's logic, we could delineate the relevant geographic market as the square mile surrounding a hospital, the block on which a hospital sits, or even a hospital building where the relevant procedure takes place. Surely a sufficiently large percentage of people in this area use the hospital's services. These "geographic markets," however, are obviously too narrow.

LRCC next argues that relevant case law does not permit us to hold that a single city is not a relevant market. This argument is problematic for two reasons. First, although we find that the geographic market in this case is implausibly narrow, our opinion should not be read to reject the notion that a city by itself could, in a different case, be a relevant geographic market. The boundaries of a relevant market will turn on the factual allegations presented in any given case. Tenet, 186 F.3d at 1052. We hold only that in this case, the theory upon which LRCC relies to reach the conclusion that a single city is the relevant geographic market is legally flawed.

Second, the cases from the Seventh Circuit, which LRCC cites in support of its position, are not contrary to our ruling in this case. The first case, United States v. Rockford Memorial Corp., 898 F.2d 1278 (7th Cir. 1990), is in fact similar to our holding in regard to its analysis of the relevant product market, and does not support LRCC's argument. In Rockford, the Seventh Circuit noted first that the district court found that 87 percent of defendants' patients came from "an area surrounding Rockford and consisting of the rest of Winnebago County (the county in which Rockford is located) and pieces of several other counties." Id. at 1284. Thus, Rockford first noted the defendant's trade area. The court then moved to the second prong of the analysis, stating that patients within this market were unlikely to seek out other hospitals in the event of anticompetitive pricing and therefore upheld it as the relevant geographic market. Id. at 1285. This is not analogous to LRCC's case. Rather than arguing that the vast majority of Baptist Health's patients come from Little Rock, which would be analogous to Rockford, LRCC supports its geographic market with the allegation that the vast majority of cardiology patients go to hospitals in Little Rock. The distinction between these two scenarios is not without a difference. As stated above, were we to adopt LRCC's logic, we would be opening the door to creation of geographic markets with narrowness limited only by antitrust plaintiffs' imagination. We refuse to do this.

The second case on which LRCC relies, Hospital Corp. of America v. F.T.C., 807 F.2d 1381 (7th Cir. 1986), is equally unavailing. Because market definition was

not at issue in that case, <u>see</u> <u>id.</u> at 1388, it stands for no more than that a city could, given the right allegations, be a relevant geographic market.[6] We do not dispute this conclusion, nor does it affect our analysis in this case.

Moreover, we do not mean to endorse the idea that a firm's trade area is equivalent to a relevant geographic market. There is voluminous case law cautioning against such a holding. <u>See, e.g.</u>, <u>Bathke</u>, 64 F.3d at 346; <u>Unity Hosp.</u>, 208 F.3d at 662; <u>Gordon v. Lewistown Hosp.</u>, 423 F.3d 184, 212 (3d Cir. 2005); <u>Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish</u>, 309 F.3d 836, 840 (5th Cir. 2002); <u>see also</u> <u>Herbert Hovenkamp, Federal Antitrust Policy</u>, § 3.6d, at 119 (3d ed. 2005) ("'trade area' and the 'relevant market' are precisely reverse concepts"). Because plaintiffs must identify consumers' alternatives, the relevant geographic market will often be larger than a firm's trade area. This well-established principle does not alter our holding. We hold only that where, as here, an antitrust plaintiff alleges that a firm competes in and draws its customers from a specified geographic area, it cannot then limit the relevant geographic market to a location smaller than that area based solely on the fact that consumers must travel to that smaller area to obtain the relevant service or product. To do so would allow antitrust plaintiffs to gerrymander the relevant geographic markets into artificially narrow locations, as LRCC has attempted to do here.

---

[6]In addition, LRCC cites a series of district court cases in support of their relevant geographic market. <u>See</u> <u>United States v. Long Island Jewish Med. Ctr.</u>, 983 F. Supp. 121, 141–42 (E.D.N.Y. 1997); <u>HTI Health Servs., Inc. v. Quorum Health Group, Inc.</u>, 960 F. Supp. 1104, 1126 (S.D. Miss. 1997); <u>Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.</u>, No. C93 20616 RMW, 1995 WL 853037, at *8–11 (N.D. Cal. Sept. 7, 1995). These cases stand only for the proposition that, given the correct allegations, a small city area can constitute a relevant geographic market and are therefore not helpful to LRCC. In fact, <u>Santa Cruz Med.</u>, cuts against LRCC, as it notes, "Ideally, an area should be defined where few patients leave an area *and* few patients enter an area to obtain hospital services." <u>Id.</u> at *8 (emphasis added).

We are well aware of our court's reluctance to dismiss antitrust complaints before the parties have had an opportunity to fully conduct discovery. Huelsman v. Civic Ctr. Corp., 873 F.2d 1171, 1174 (8th Cir. 1989) (stating that a "dismissal . . . on the pleadings should be 'granted sparingly and with caution.'") (citation omitted). However, more discovery in this case could not cure the defects in LRCC's legal theory as to either the relevant product or geographic market. Without a showing as to the proper relevant market, LRCC cannot establish the necessary predicate for their antitrust claims. For this reason, we affirm the district court's dismissal of LRCC's antitrust claims.

## III. Costs Claim[7]

Rule 54(d) of the Federal Rules of Civil Procedure gives district courts the power to tax costs in favor of a prevailing party. These awards, however, must fit within 28 U.S.C. § 1920, which enumerates the costs that a district court may tax. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441–42 (1987). The section at issue in this case, § 1920(4), states that a judge may tax "costs of making copies of any materials where the copies are necessarily obtained for use in the case." District courts have broad discretion over the award of costs to a prevailing party under § 1920, and we review such a decision for abuse of discretion. Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 363 (8th Cir. 1997). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous

_____

[7] On July 16, 2009, LRCC submitted to us, pursuant to Federal Rule of Civil Procedure 28(j), a letter indicating that Baptist Health should be judicially estopped from seeking discovery-related copying costs because it had previously argued that such costs are not taxable. See Platte River Ins. Co. v. Baptist Heath, et al., No. 4:07cv0036 SWW, 2009 WL 2044610 (E.D. Ark. July 10, 2009). Because Baptist Health's previous position took place in an unrelated proceeding against a different party, we find that Baptist Health is not estopped from taking its current position. See Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1142 (8th Cir. 1998) ("The doctrine of judicial estoppel prohibits a party from taking inconsistent positions in the same or related litigation.").

legal conclusions." Lankford v. Sherman, 451 F.3d 496, 503–04 (8th Cir. 2006). Here, the district court declined to tax as costs Baptist Health's expenses related to copying documents to be produced in discovery. Baptist Health cross-appeals this holding and, in the event we reverse the district court, argues that costs for scanning documents and reproducing Electronically Stored Information ("ESI") fall within "copies of any materials" as used in § 1920(4). Because there is no allegation of erroneous factual findings, we address whether the district court's holding hinges on erroneous legal conclusions.

The threshold issue here is whether the district court erred in declining to tax discovery-related copying expenses. It is unclear whether the district court ruled as a matter of law or as a matter of its discretion. We believe, however, that it is fair to read the opinion as an exercise of the district court's discretion. Therefore, we confine our holding to the conclusion that the district court did not abuse its discretion. We reach this conclusion for two reasons.

First, Baptist Health does not cite, nor are we aware of, any decision that *requires* a district court to tax discovery-related expenses. We note that there are cases suggesting that a district court may tax costs for discovery-related copying. See, e.g., Slagenweit v. Slagenweit, 63 F.3d 719, 721 (8th Cir. 1995) (per curiam) (upholding award of costs for a deposition copy, despite the fact that the deposition was not introduced at trial). These cases are at most permissive, and do not compel the district court to tax such costs. Moreover, cases from other circuits that have explicitly addressed discovery-related copying costs have done so only to the extent that they have found a district court did not abuse its discretion in taxing such costs. See, e.g., E.E.O.C. v. W&O, Inc., 213 F.3d 600, 623 (11th Cir. 2000); Illinois v. Sangamo Const. Co., 657 F.2d 855, 867 (7th Cir. 1981).

Second, numerous district courts within the Eighth Circuit have refused to tax discovery-related copying costs. See, e.g., Jones v. Nat'l Am. Univ., No. CIV. 06-5075-KES, 2009 WL 2005293, at *6 (D.S.D. July 8, 2009) (stating that copies of

papers "necessarily obtained for use in the case" covers only the "cost of actually trying a case in the courtroom"); <u>Moore v. DaimlerChrysler Corp.</u>, No. 4:06CV757 CDP, 2007 WL 1445591, at *1 (E.D. Mo. May 11, 2007) (same); <u>Sphere Drake Ins. PLC v. Trisko</u>, 66 F. Supp. 2d 1088, 1093–94 (D. Minn. 1999) (same); <u>Emmenegger v. Bull Moose Tube Co.</u>, 33 F. Supp. 2d 1127, 1133–34 (E.D. Mo. 1998) (same). Given this, we cannot find that the district court abused its discretion. Because we affirm the district court on this threshold issue, we do not reach the issue of whether costs for scanning documents and reproducing ESI are taxable under § 1920(4).

## IV. Conclusion

For the foregoing reasons, we affirm the district court on both the antitrust and costs claims.

_____