# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3325

_____

| | | |
|---|---|---|
| Southeast Missouri Hospital, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Saint Francis Medical Center, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| C.R. Bard, Inc., | * | |
| | * | |
| Defendant-Appellee, | * | |
| | * | |
| Tyco International, US, Inc.; Tyco | * | |
| Health Care Group; John Does 1-10, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| ---------------------------- | * | |
| | * | |
| Attorney General of the State of | * | |
| Missouri, | * | |
| | * | |
| Amicus on Behalf of | * | |
| Appellant. | * | |

_____

Submitted: June 15, 2010
Filed: June 8, 2011

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Saint Francis Medical Center brought this class action suit against C.R. Bard, Inc., a supplier of medical supplies. According to Saint Francis, Bard's contracts with Group Purchasing Organizations violate sections 1 and 2 of the Sherman Act, section 3 of the Clayton Act, and Missouri antitrust law. See 15 U.S.C. §§ 1, 2; 15 U.S.C. § 14; Mo. Rev. Stat. § 416.031 (2000). Saint Francis seeks relief under sections 4 and 16 of the Clayton Act, and Missouri law. *See* 15 U.S.C. §§ 15, 26; Mo. Rev. Stat. § 416.121.1 (2000). The district court[1] granted summary judgment to Bard. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Saint Francis Medical Center, a hospital in Cape Girardeau, is a member of Novation, a Group Purchasing Organization. GPOs negotiate standard contracts with suppliers on behalf of member hospitals. According to the parties, 96 to 98 percent of all hospitals in the United States belong to one or more GPOs. GPO membership is voluntary. Hospitals can (and do) switch from one GPO to another, and may belong to multiple GPOs. GPOs do not purchase supplies; member hospitals do, under the terms of GPO-negotiated contracts. GPO contracts with suppliers typically last three to eight years, and may be terminated by either side, with notice. Once a GPO contracts with a supplier, its member hospitals may sign letters of commitment, accepting the terms of the GPO contracts. A member hospital's commitment may be terminated at any time, with notice to the supplier. For the GPO contract between

_____

[1]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri. The parties consented to trial before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), with direct review to this court.

Novation and Bard for 2005 through 2008, the Acute Urologicals Letter of Commitment – covering catheters – states: "Member reserves the right to terminate this letter of commitment at any time upon notice to Bard."

GPO-member hospitals are not required to purchase through their GPO contracts. GPO-member hospitals can purchase supplies, like catheters, "off-contract," negotiating their own prices with suppliers. On average, hospitals save between 10 and 15 percent on their medical device purchases by buying under GPO contracts.

Bard sells medical supplies, including catheters. Bard is the leading U.S. supplier of Foley catheters–tubes attached to an inflatable balloon used to drain a patient's bladder over extended periods of time. From 2003 through 2008, Bard made over 80 percent of Foley sales to hospitals. Bard also has a significant share of the U.S. market for intermittent catheters–tubes used to drain a patient's bladder and discarded after each use.[2]

Saint Francis purchases Bard's catheters through a GPO. According to Saint Francis, Bard abuses its dominant position in the catheter market in contracting with GPOs, inflating prices for hospitals. Specifically, Saint Francis objects to sole-source provisions, share-based discounts, and bundled discounts in Bard's GPO contracts.

Bard prefers sole-source contracts with GPOs. In sole-source contracts, Bard is the only supplier of catheters on the GPO's price list provided to member hospitals, and thus the only seller under the terms in the GPO contract. In addition, according to Saint Francis, Bard's sole-source contracts with one GPO (Novation) from 2001 to 2005 urged participating member hospitals not to solicit proposals from Bard's

_____

[2]According to Bard, its market share for intermittent catheters between 2003 and 2006 was 34 percent. Saint Francis counters that Bard's share of intermittent catheter sales *under GPO contracts* exceeded 60 percent from 2003 to 2008.

competitors or conduct product evaluations of competitors' products. As the district court found, "there is 'fierce competition' for sole-source contracts." Hospitals that buy Bard catheters under sole or dual-source contracts generally pay less than hospitals that do not. Even under sole-source agreements, however, member hospitals may purchase off-contract. Member hospitals may terminate an existing contract at will and on short notice.

Several of Bard's GPO contracts include tiered pricing: hospitals get share-based discounts for purchasing higher percentages of supplies from Bard. The largest discounts go to hospitals that buy at least 85 percent of certain listed products from Bard. Lesser discounts are offered to hospitals that buy between 50 and 84 percent, and less than 50 percent, respectively, of their product needs from Bard. None of the GPO contracts give hospitals a discount for buying Bard catheters exclusively.

The GPO contracts also offer discounts to hospitals buying other Bard medical supplies along with catheters. These "bundled discounts" allow hospitals to pay a lower price for several medical products purchased together than when purchased separately. Bundles in the GPO contracts include catheters and related products, like drainage bags and urine meters.

After both Saint Francis and Bard moved for summary judgment, the district court ruled for Bard, finding no antitrust violation. Saint Francis appealed, and this court filed an opinion, 616 F.3d 888 (2010), which this court later vacated.

II.

This court reviews the district court's grant of summary judgment de novo. *See, e.g., **Amerinet, Inc. v. Xerox Corp.**,* 972 F.2d 1483, 1489-90 (8th Cir.), *cert. denied*, 506 U.S. 1080 (1993). A grant of summary judgment is appropriate only where the record, read most favorably to the non-moving party, indicates that "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(a)**; *see also* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 321-23 (1986). There is no different or heightened summary judgment standard in complex antitrust cases. *See* ***Amerinet***, 972 F.2d at 1490.

According to Saint Francis, Bard's sole-source GPO contracts, share-based discounts, and bundled discounts unreasonably restrain trade in violation of sections 1 and 2 of the Sherman Act, section 3 of the Clayton Act, and the Missouri antitrust law.[3] *See* **15 U.S.C. §§ 1, 2**; **15 U.S.C. § 14, 15, 26**; **Mo. Rev. Stat. § 416.031** (2000). Saint Francis's theory is that, while hospitals (even those participating in sole-source GPO contracts) may purchase catheters from other suppliers, Bard's GPO contracts are *de facto* exclusionary because the discount prices are so attractive that hospitals cannot afford to forgo them. *See* ***Concord Boat Corp. v. Brunswick Corp.***, 207 F.3d 1039, 1058 (8th Cir. 2000) (claims under Section 1 of the Sherman Act "that allege only de facto exclusive dealing may be viable.").

### III.

Saint Francis's challenge to the share-based discounts is precluded by this court's decision in *Concord Boat*. There, boat builders brought antitrust challenges against engine-supplier Brunswick, attacking its market-share-discount program. Brunswick offered market-share discounts to boat builders who agreed to purchase a certain percent of their engines from Brunswick. The boat builders claimed the program placed them in "'golden handcuffs,' such that boat builders and dealers had no choice but to purchase engines from [Brunswick]." *Concord Boat*, 207 F.3d at 1060. These agreements–though not contractually exclusive–were so attractive, argued the boat builders, that they became *de facto* exclusive arrangements.

---

[3]Missouri antitrust statutes are construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes." **Mo. Rev. Stat. § 416.141** (2000).

Under the agreements in *Concord Boat*, "customers were not required either to purchase 100% from Brunswick or to refrain from purchasing from competitors in order to receive the discount." *Id*. at 1063. Any contracts between the boat builders and Brunswick were voluntary. "The programs did not require the boat builders to commit to Brunswick for any specified period of time." *Id*. at 1059. The boat builders were "free to walk away from the discounts at any time" and did so when other manufacturers offered superior discounts. *Id*. Based on the voluntary nature of the agreements between Brunswick and the boat builders, as well as the boat builders' willingness to purchase their engines elsewhere for better discounts, this court reversed a jury verdict for the boat builders, finding that the discount agreements were not *de facto* exclusionary dealing. *Id*. at 1060.

Here, as in *Concord Boat*, Bard offered share-based discounts. Share-based discounts gave hospitals discounts for committing to purchase specified percentages of their catheter needs from Bard. The greater the percentage, the greater the discount. In order to receive these discounts, hospitals were not required to purchase 100 percent of their catheter needs from Bard, or to refrain from purchasing from competitors. Nor did the GPO discount agreements contractually obligate hospitals to purchase anything from Bard. If a hospital purchased less than the agreed upon percent, it simply lost its negotiated discount. Contrary to Saint Francis's position, the share-based discounts here parallel those in *Concord Boat*.

Saint Francis attempts to distinguish this case from *Concord Boat*, emphasizing that the sole-source contracts and bundled discounts offered by Bard in this case were not offered by Brunswick in the *Concord Boat* case. Saint Francis ignores that the share-based discounts are the heart of the sole-source contracts, and the centerpiece of the bundled discounts. The legal principles in *Concord Boat* do apply in this case.

IV.

The *Concord Boat* case makes clear that the threshold requirement for Saint Francis's antitrust claims is determining the relevant market. *Id*. at 1044. To prevail on any of its claims, Saint Francis has the burden of identifying a relevant market. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[T]o state a Sherman Act claim under either section 1 or section 2, the plaintiff must identify a valid relevant market."); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961) (a relevant market is critical to a claim under section 3 of the Clayton Act). On summary judgment, a nonmovant must demonstrate a genuine dispute as to this material fact. *See Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 690 (8th Cir. 1993) ("Like any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor."); *Morgenstern v. Wilson*, 29 F.3d 1291, 1296-97 (8th Cir.), *cert. denied*, 513 U.S. 1150 (1995). Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition. *See FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995). "Antitrust claims often rise or fall on the definition of the relevant market." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995). A relevant market consists of both a geographic market and a product market. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir.), *cert. denied*, 130 S.Ct. 3506 (2010). The parties agree that the geographic market is the United States. The issue is the relevant product market.

The outer boundaries of a product market can be determined by the reasonable interchangeability, or cross-elasticity of demand, between the product itself and possible substitutes for it. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d, 242, 246 (8th Cir.), *cert. denied*, 493 U.S. 809 (1989). Determining the limits of a relevant product market requires identifying the choices available to customers. *Craftsmen*

*Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007); *see also* **Horizontal Merger Guidelines § 1, 57 Fed. Reg. 41, 552 (1992)** ("Market definition focuses solely on demand substitution factors–i.e., possible consumer responses."). This determination focuses on how "consumers will shift from one product to the other in response to changes in their relative costs." *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981). Evidence that consumers will substitute one product for another in response to a slight decrease in price, strongly indicates those products compete in the same product market. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956).

A.

A broad product market may contain well-defined submarkets that themselves are product markets for antitrust analysis. *Brown Shoe*, 370 U.S. at 325. As described in *Brown Shoe*, a submarket may be identified by industry or public recognition of its separate economic character, special uses or characteristics or production facilities, distinct customers or prices, price sensitivity, and specialized vendors. *Id*.

The indicia in *Brown Shoe* are instructive in determining the existence of a submarket, but the presence of some, and absence of others, is not dispositive. *See C.E. Services, Inc. v. Control Data Corp.*, 759 F.2d 1241, 1246 (5th Cir. 1985) ("The existence of one or more of these [*Brown Shoe*] indices does not necessarily preclude a summary determination that certain products or services either are reasonably interchangeable or demonstrate a high cross-elasticity of demand."); *International Tel. & Tele. Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975), *overruled on other grounds*, *California v. American Stores Co.*, 495 U.S. 271, 295 (1990) (noting that the *Brown Shoe* indicia "were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather

than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue.").

Saint Francis claims that there are two product submarkets: one for Foley catheters sold under GPO contracts to hospitals, and another for intermittent catheters sold under GPO contracts to hospitals. Under this view, Foley catheters sold to hospitals under GPO contracts would be a separate product submarket from Foley catheters sold through other channels.

To support this argument–that distribution channels for identical products can be submarkets–Saint Francis cites this court's *Henry* decision. *See Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir. 1987). There, reviewing a jury verdict, this court held that automobile batteries sold by route-truck distribution was a valid submarket. *Id*. at 1343. Applying the *Brown Shoe* indicia, this court determined that the industry recognized route-truck distributors as a separate entity, route-truck sales employed specialized vendors who served distinct customers, and route customers paid higher prices and did not alter their purchasing choices in response to price changes. *Id*. at 1342-43.

Saint Francis does offer some evidence of industry manufacturers' belief that securing GPO contracts is integral to their business. Specifically, Saint Francis points to a Bard document stating, "Virtually all major device manufacturers are acknowledging the necessity of negotiation with GPOs," statements by other industry executives blaming poor product sales on being excluded from GPO contracts, and the existence of GPO contracts themselves. Saint Francis has satisfied the summary judgment standard as to the first *Brown Shoe* indicator. Saint Francis does not argue that catheters sold through GPOs have special uses, characteristics or production facilities. Saint Francis also does not establish any of the remaining *Brown Shoe* indicia.

In *Henry*, the route-distribution providers were specialized vendors who provided expertise and advice to distinct customers with specific needs. *See id*. at 1342 ("Route sales were directed to a particular type of customer: the small service-station owner who sells only a few batteries a week and who 'needs some advice and maybe some help on moving his product.'"). Here, GPOs are not specialized vendors; the vendors are the same whether sales are GPO or non-GPO. Saint Francis does not rely on GPOs to gather product information or make product recommendations about catheters. Nor is Saint Francis unable to find catheters outside of GPOs, through independent channels. *Cf*. *United States v. Grinnell Corp.*, 384 U.S. 563, 574 (1966) (when a firm or firms distinguish themselves by offering particular packages of goods or services, there may exist a core group of consumers for whom "only [that package] will do.").

In *Henry*, the method of delivery was integral to making the product unique and appealing to a specific class of customers. *Compare* ***Henry***, 809 F.2d at 1342, *and* ***CBS, Inc. v. FTC***, 414 F.2d 974, 978-79 (7th Cir. 1969) (recognizing mail order records as a submarket because the record clubs met the needs of specific consumers who would not shop at retail stores), *with* ***M.A.P. Oil Comp., Inc. v. Texaco, Inc.***, 691 F.2d 1303, 1307-08 (9th Cir. 1982) (distribution services for gasoline was not, as a matter of law, a separate submarket from the sale of gasoline itself because "[c]ustomers can choose between direct delivery of gasoline and delivery through distributors or commissions agents, but in the final analysis they purchase a single product–gasoline."), *and* ***Pepsico, Inc. v. Coca-Cola Comp.***, 315 F.3d 101, 105-08 (2d Cir. 2002) (affirming the district court's summary determination that a specific distribution channel was not a submarket where most customers stated that the method of delivery did not determine their choice of fountain syrup–Fountain syrup delivered by bottler distributors was an "acceptable substitute" for fountain syrup delivered by independent food service distributors). Saint Francis does not purchase catheters through GPOs because they offer better delivery methods (catheters are delivered the same way, regardless of how they are bought). In the end, GPOs provide none of the

additional distribution efficiencies and advantages that this court used to recognize a submarket in *Henry*.

Saint Francis further argues that catheters sold under GPO contracts are not reasonably interchangeable with those sold independently, due to the "significant cost savings" under GPO contracts. The Supreme Court has repeatedly said that for identical items, a price differential alone does not establish two separate product markets. *See **Brown Shoe Co.*** 370 U.S. at 326 (specifically rejecting the argument that a "predominantly medium-priced shoe . . . occup[ied] a product market different from the predominantly low-priced shoe."); ***United States v. Cont'l Can Co.***, 378 U.S. 441, 455 (1964) ("[P]rice is only one factor in a user's choice between one [product] or the other. That there are price differentials between the two products or that the demand for one is not particularly or immediately responsive to changes in the price of the other are relevant matters but not determinative of the product market issue."); *see also **HDC Med., Inc. v. Minntech Corp.***, 474 F.3d 543, 547-48 (8th Cir. 2007) (noting that a price differential alone cannot support separating otherwise identical products into distinct product markets). *Concord Boat* says that "cutting prices in order to increase business often is the very essence of competition." 207 F.3d at 1061. The "Supreme Court has urged great caution and a skeptical eye when dealing with unfair pricing claims." *Id*. at 1060 (internal quotations omitted).

Even if a price differential were relevant here, Saint Francis identifies no evidence of any uniform "significant cost savings" from purchasing GPO catheters compared to non-GPO catheters. Competitors such as Tyco and Rochester offered non-GPO catheters that were cheaper than the Bard-GPO catheters. Saint Francis offers no evidence that it did not purchase cheaper catheters because it feared losing other, more significant discounts. Instead, the record indicates that Saint Francis forfeited the savings offered by other manufacturers, and purchased Bard catheters, because its physicians preferred them and physician preference accounted for "85% of the decision" about what catheters to purchase . *See, e.g.*, *id*. at 1056 ("[Expert's]

opinion that Brunswick's discount programs imposed a tax on boat builders who chose to purchase engines from other manufacturers is not supported by the evidence that some boat builders chose to purchase 100% of their engines from Brunswick when they only needed to purchase 80% to qualify for the maximum discount."). According to Saint Francis's head of purchasing, when Tyco offered Saint Francis cheaper catheters, "the surgeons at the hospital would not allow it."

Saint Francis's main expert asserts that a small but significant non-transitory increase in price (SSNIP) "in the GPO market does not cause customers to switch their purchases to another distribution channel." True, in theory, if customers do not switch products in response to an SSNIP (generally a 5 percent increase in price), a separate submarket may exist. *See* **Horizontal Merger Guidelines § 1.11, 57 Fed. Reg. 41, 552 (1992)** ("In attempting to determine objectively the effect of a 'small but significant and non-transitory increase in price,' the [FTC], in most contexts, will use a price increase of five percent lasting for the foreseeable future."); s*ee also **Henry***, 809 F.2d at 1342 (automobile batteries sold through route sales was a valid submarket in part because "[r]oute distribution customers did not shift readily to other sources of batteries in response to price changes."). Saint Francis's expert, however, offers no market studies to support this claim, making the assertion without analytic or even anecdotal evidence. *Cf.* ***FTC v. Whole Foods Market, Inc.***, 548 F.3d 1028, 1037-40 (D.C. Cir. 2008) (Brown, J., with Tatel, J., concurring in judgment) (experts disagreed about the appropriate method for an SSNIP analysis–critical loss versus critical diversion–but each conducted extensive hypothetical analysis); ***United States v. Oracle Corp.***, 331 F.Supp.2d 1098, 1145-49 (N.D.Cal. 2004) (expert included significant, specific, and extensive analysis of the factors thought to be relevant to making a hypothetical claim based on an SSNIP). In *Concord Boat*, this court rejected the expert opinion offered by the boat builders because the resulting conclusions were "mere speculation." 207 F.3d at 1057 ("Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'" (quoting ***Weisgram v. Marley Co.***, 528 U.S. 440, 442 (2000))).

Although Saint Francis's expert is a highly regarded economist and a "battle of the experts" could identify a disputed issue of material fact, *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005), at least some facts must be identified that support the expert's theory.

Saint Francis finally argues that here, unlike in *Concord Boat,* there is empirical evidence that the catheter market has been foreclosed. The empirical evidence Saint Francis cites assumed that a hospital was foreclosed to Bard's rivals when it purchased a Bard catheter under a GPO contract, or at the highest tier of a share-based discount. As *Concord Boat* directs, however, in determining whether a market is foreclosed, the relevant inquiry is what products are reasonably available to a consumer, not what products the consumer ultimately chooses to buy. 207 F.3d at 1059.

Saint Francis has failed to satisfy the *Brown Shoe* factors for a relevant product submarket.

## B.

Emphasizing "economic realities," Saint Francis stresses one feature of some GPO contracts, "claw-back" provisions that permit Bard to recapture discounts if hospitals do not purchase enough products under their GPO contract. Saint Francis asserts that these contract terms deter hospitals from switching to other manufacturers.

The record does not support this claim. Hospitals may (and do) purchase products off-contract, including catheters, if they can get a better product or a better price. Because the GPO-negotiated contracts are voluntary agreements, terminable at will and on short notice, any hospital could, at any time, decide to forego the offered discounts and purchase catheters from a different brand. *See Concord Boat*, 207 F.3d at 1059 (noting that the actual behavior of the boat builders indicated that

they were willing and able to switch to other engine suppliers). In fact, Saint Francis's own head of purchasing had "no loyalty to any GPO." He testified, "If the decision [of what catheters to purchase] was up to me, I would have threw both GPOs out and tried to negotiate it myself." But, physician preference controlled "85% of the [catheter purchasing] decision."

Saint Francis's only claw-back example refutes its argument. Saint Francis describes another hospital that "switched from Bard to Tyco for its Foley trays and drainage bags . . . because doing so saved $20,000 per year–more than enough to compensate for the $2,250 penalty Bard charged the hospital for defecting from its purchasing obligations." On this record, the penalties do not prevent hospitals from switching from GPO to non-GPO products in order to take advantage of better offers.[4]

## C.

A relevant market is made up of products that consumers view as reasonable substitutes. Saint Francis tries to narrow the scope of the product market but fails to offer sufficient evidence that Foley and intermittent catheters sold through GPO contracts are distinct product submarkets from those sold through other channels.

---

[4] Saint Francis's legal theory is also suspect. "A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438, 441 (3d Cir. 1997) (holding that a product market consisting of interchangeable goods–pizza sauce, dough, and paper cups–cannot be sub-divided by contractual restraints that require a franchisee to purchase these goods from a certain supplier–Domino's).

V.

Saint Francis's brief on appeal includes the argument that the entire United States market for Foley catheters–both GPO-contracted and non-GPO–is the relevant product market. However, throughout the district court proceedings, Saint Francis referred to the GPO distribution channel as the only relevant product market. In its statement of uncontroverted material facts in response to Bard's motion for summary judgment, Saint Francis states, "There are two relevant product markets at issue in this case . . . (i) the market for the sale of Foley catheters to purchasers through group purchasing organizations ("GPOs"); and (ii) the market for sale of intermittent (or urethral) catheters to purchasers through GPOs." And, in its own motion for partial summary judgment, Saint Francis reiterates this relevant market, arguing that "Bard's GPO contracts have caused anticompetitive effects in the market for Foley catheters sold through GPOs."

Saint Francis argues that it did allege the all-Foley-catheter product market in the district court, directing this court to its second amended complaint that identified the relevant market as "internal Urological Catheters sold in the United States." This vague description is meaningless because, until this appeal, Saint Francis does not again refer to the all-Foley-catheter market as the relevant product market. *See Hopkins v. Saunders*, 199 F.3d 968, 974-75 (8th Cir. 1999) (arguments included in the complaint but not asserted to the district court were waived on appeal); *Celotex*, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves.") (emphasis added); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) ("Even an issue raised in the complaint but ignored at summary judgment may be deemed waived.").

Saint Francis also points to a footnote in its expert's Daubert declaration (which is repeated in its response to Bard's summary judgment motion). The

footnote–"Plaintiff's expert . . . has testified that his opinions regarding Bard's anticompetitive conduct also apply to broader alternative markets which include all sales of Foley catheters"–does not satisfy Saint Francis's duty to present an argument that the district court can review. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (It is "not the [d]istrict [c]ourt's responsibility to sift through the record to see if, perhaps, there was an issue of fact."); *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's argument.").

By failing to make the all-Foley-catheter argument to the district court, Saint Francis has waived this argument. *See Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 715 (8th Cir. 2004)("[O]nly those matters properly before [the] district court for summary judgment consideration are subject to appellate review.") (citations omitted) (alternations in original); *see also KPERS v. Blackwell, Sanders, Matheny, Weary, & Lombardi, L.C.*, 114 F.3d 679, 688 (8th Cir.), *cert. denied*, 552 U.S. 1068 (1998); *Roth v. G.D. Searle & Co.*, 27 F.3d 1303, 1307 (8th Cir. 1994).

## VI.

Based on the precedent of *Concord Boat*, and specifically Saint Francis's failure to identify a relevant submarket, the judgment of the district court granting summary judgment to Bard is affirmed.

BEAM, Circuit Judge, dissenting.

Saint Francis Medical Center, on behalf of itself and a class of urological catheter purchasers, appeals the district court's grant of summary judgment to C.R. Bard in this antitrust class action. I would reverse and remand.

## I.  BACKGROUND

Bard is the leading manufacturer of Foley catheters and related products and markets its products to healthcare providers.  With respect to this action, Bard manufactures three types of catheters: standard Foley catheters, infection-control Foley catheters,[5] and intermittent catheters.  Foley catheters are either silicone or latex devices with an inflatable balloon at one end to hold the catheter in place, allowing the catheter to drain a patient's bladder over extended periods of time.  Unlike a Foley catheter, an intermittent catheter is a single-use catheter.  The parties agree that Foley catheters are not interchangeable with intermittent catheters.

Hospitals such as Saint Francis purchase these catheters in one of four ways: (1) without a contract, thereby paying the manufacturer's list price; (2) by negotiating an individual contract, referred to as a "local agreement"; (3) by belonging to an Integrated Delivery Network (IDN), a collection of affiliated hospitals that conduct centralized purchasing; or (4) by joining a Group Purchasing Organization (GPO), an organization that negotiates supply agreements with multiple manufacturers on behalf of member hospitals.  As concerns the purchase of the catheters at issue in this case, the record reveals that hospitals sometimes employ a combination of these methods in purchasing catheters.  Thus, if a hospital can achieve a cheaper price for the product it desires by going "off-contract" or by negotiating an individual contract, it may do so despite also being a member of a GPO.  It is undisputed, however, that hospitals purchase a large percentage of catheters through the use of a GPO contract.  In fact, according to Saint Francis, approximately eighty-five percent of all Foley and intermittent catheters purchased by hospitals are purchased through GPOs.

___

[5]Both standard and infection-control Foley catheters are used for the same purpose.  The only difference between the two is that the infection-control Foley catheters are treated with an anti-microbial agent intended to reduce the occurrence of urinary tract infections.

In an effort to capitalize on GPO sales, Bard bids on numerous GPO contracts. Saint Francis contends that in this "bidding" process, Bard has effectively foreclosed the GPO market from its competitors by only bidding on sole-source or dual-source GPOs and including a variety of anticompetitive terms: (1) share-based requirements; (2) bundled discounts; and (3) tiered rebates. As a result of this conduct, Saint Francis alleges that it has been forced to pay an above-market price for catheters and related products in violation of the antitrust laws. Accordingly, Saint Francis brought this action for violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act and the Missouri Antitrust Law.

Bard filed a motion for summary judgment which the district court granted and Saint Francis now appeals. Because I believe there are disputed questions of material fact, I would reverse and remand.

## II.    DISCUSSION

"We review de novo a grant of summary judgment, considering the facts in the light most favorable to the nonmoving party. Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." HDC Med., Inc. v. Minntech Corp., 474 F.3d 543, 546 (8th Cir. 2007) (quotation omitted). The primary issue I have with the district court is that it weighed the evidence and resolved disputed questions of fact in favor of Bard, the moving party. Such a resolution of disputed questions of fact is inappropriate on summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### A.    Relevant Product Market

Under the Sherman Antitrust Act, "it is unlawful to contract or form a conspiracy 'in restraint of trade or commerce among the several States,' 15 U.S.C. § 1, or to 'monopolize or attempt to monopolize . . . any part of the trade or commerce

among the several States,' 15 U.S.C. § 2." Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 596 (8th Cir. 2009) (omission in original), cert. denied, 130 S. Ct. 3506 (2010). Saint Francis has not alleged a per se violation, therefore it must establish a relevant market. See id.; see also Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998) ("[T]o state a Sherman Act claim under either section 1 or section 2, the plaintiff must identify a valid relevant market."). "A relevant market consists of both a product market and a geographic market." Little Rock, 591 F.3d at 596. The parties agree that the geographic market is the United States. Thus, the question for our review is whether Saint Francis has presented sufficient evidence of a relevant product market. See HDC Med., 474 F.3d at 547 ("The relevant product market is a question of fact, which the plaintiff bears the burden of proving.").

"The boundaries of the product market can be determined by the reasonable interchangeability or cross-elasticity of demand between the product itself and possible substitutes for it." Id. Saint Francis contends that it presented substantial evidence of (1) a product market for all distributions of Foley catheters and all distributions of intermittent catheters; and/or (2) the separate and distinct submarket for Foley and intermittent catheter sales made through GPOs. The district court disagreed and held that (1) neither Foley nor intermittent catheters constitute a relevant product market because particular consumers prefer particular brands and makes of catheters; and (2) the GPO submarket was not a relevant product market as a matter of law. In my view, Saint Francis has presented sufficient evidence to create a genuine issue of fact as to whether either of these markets constitutes a relevant product market.

### 1. All Foley and All Intermittent Markets

The district court held that because particular consumers prefer particular brands and makes of Foley and intermittent catheters, there was no cross-elasticity of

demand between the product and possible substitutes for it. And, the record does contain evidence tending to show that physicians have preferences for catheters depending on whether they are latex or silicone, the reputation of the manufacturer, the rate of infection control, whether the manufacturer has a full line of ancillary products, and whether the clinicians have experience with the catheters. However, even Bard itself acknowledges that "a Bard Foley catheter sold to a hospital under a GPO contract is . . . interchangeable with an equivalent Tyco catheter." Appellee's Br. 32. And, there was testimony indicating that the catheters were commodity products, not physician preference items. Appellant's App. 2309-10, 2455, 3682-85. Finally, the only evidence in the record which conclusively establishes a "lack of interchangeability" of products indicates that Foley catheters are not interchangeable with intermittent catheters. But, the record would support a factual finding that all Foley catheters are interchangeable with all other Foley catheters regardless of brand or presence of antimicrobial agents. Id. 1544 n.34, 3681-82, 3701. And, there was similar evidence on the record supporting a similar conclusion with respect to intermittent catheters. Id. 2310. Thus, while physician brand preferences might influence a jury to find that a Bard Foley catheter is not interchangeable with a Tyco Foley catheter, "determining the relevant product market is a factual issue which is reserved to the jury, [and] we are not permitted to weigh the evidence." Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 805 (8th Cir. 1987).

On appeal, Bard does not attempt to defend the district court's opinion. Instead, Bard asserts that Saint Francis failed to argue–and therefore waived–this definition of a product market. I disagree. First, the fact that the district court discussed this product market belies Bard's assertion that Saint Francis never made the argument. Second, the record contains facts supporting and discussing this market. Appellant's App. 4118 n.11. Third, Saint Francis specifically raised the issue in its complaint. Fourth, Saint Francis at least mentioned this market in its summary judgment papers. And fifth, that Saint Francis chose to focus its argument on the submarket–discussed

-20-

below–only indicates that it was trying to persuade the district court to adopt this more narrow market. Accordingly, Saint Francis did not waive this argument.

## 2. The GPO Submarket

Saint Francis also maintains that within the national market for the sale of all Foley and intermittent catheters is a distinct submarket: Foley and intermittent catheters sold through GPOs. "As described in Brown Shoe [Co. v. United States, 370 U.S. 294, 325 (1962)], such a submarket may be identified by industry or public recognition of its separate character, special uses or characteristics or production facilities, distinct customers or prices, price sensitivity, and specialized vendors." Henry v. Chloride, Inc., 809 F.2d 1334, 1342 (8th Cir. 1987).

The district court rejected the GPO submarket because (1) "Plaintiffs have not established that all Foley catheters or all intermittent catheters are reasonably interchangeable products"; and (2) such a market "improperly manipulates the boundaries of the product market by including in the definition the tool by which Plaintiffs allege Bard is restraining trade–the GPOs." The first of these two arguments fails for the reasons stated above–i.e., there is record evidence from which a reasonable jury could conclude that all Foley catheters are reasonably interchangeable and/or that all intermittent catheters are reasonably interchangeable. The district court's second proffered reason is similarly inappropriate on summary judgment.

Here Saint Francis does not argue that there are special uses, characteristics, or production facilities for the Foley and intermittent catheters sold through GPOs. However, Saint Francis did present evidence tending to show that (1) both purchasing hospitals and medical manufacturers recognized GPO sales as separate and distinct from non-GPO sales; (2) the GPO prices were distinct from non-GPO prices; (3) a small but significant non-transitory increase in price in the GPO sales did not cause customers to switch to a different distribution channel; and (4) the GPO's were, in

effect, specialized vendors. The only way the district court could conclude, on summary judgment, that the GPO market was not a submarket was to improperly weigh the evidence against Saint Francis. That was error.

On appeal, Bard argues that (1) hospitals themselves consider catheters sold outside GPO contracts to be interchangeable with catheters sold under GPO contracts; and (2) GPO contracts are not part of the chain of distribution for catheters. While there may be evidence in the record to support both of these propositions, the record does not compel either of these pronouncements as a matter of law.

In Henry, the plaintiff, a battery wholesaler, attempted to define the relevant product market as battery sales through route salespersons as separate and apart from battery sales from wholesale distributers. We held that although "batteries sold by route salespersons are not different in character, creation, or use from those sold from a warehouse or store . . . there was sufficient evidence for a jury to find a narrower market as well." 809 F.2d at 1342-43. Similarly, in Columbia Broadcasting System, Inc. v. F.T.C., 414 F.2d 974, 978-79 (7th Cir. 1969), the Seventh Circuit found sufficient evidence in the record to find that phonograph records sold through record clubs, though of the same character as those records sold in record stores and other outlets, constituted a separate submarket. Accordingly, the fact that the catheters at issue in this case are the same, whether sold under GPOs or not, is not conclusive evidence that the GPO is not a relevant submarket.

## B. Sherman Act

Saint Francis avers that Bard violated both Section 1 and Section 2 of the Sherman Act. The district court held that even if there was a relevant product market of Foley and one of intermittent catheters, Saint Francis failed to show that Bard engaged in anticompetitive conduct. I believe the record presents a question of fact on this issue.

### 1. Monopolization Claim (Sherman Act § 2)

Saint Francis focuses the majority of its discussion on whether it has established a Section 2 violation. I begin there. "To establish a Section 2 violation, plaintiffs must show that 1) the defendant possessed monopoly power in the relevant market and 2) the defendant willfully acquired or maintained this monopoly power by anticompetitive conduct. . . . " Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060 (8th Cir. 2000).

### a. Market Power

"Market power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market." Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1232 (8th Cir. 1987). "Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product . . . and where there are significant barriers either to the entry of new firms or to increased output by existing firms." Id. And, "[a]n eighty percent market share is within the permissible range from which an inference of monopoly power can be drawn." Morgenstern v. Wilson, 29 F.3d 1291, 1296 n.3 (8th Cir. 1994).

If the jury defines the relevant markets as the national market for all Foley catheter sales and for all intermittent catheter sales, then there is evidence that Bard possesses market power in the sale of Foley catheters. Bard's own expert found that Bard commanded 82.7% of that market. However, there is insufficient evidence to show that Bard maintained market power in the intermittent catheter market. In fact, the record indicates that Bard only has a 34% share of that national market. See id., ("As a matter of law, absent other relevant factors, a thirty percent market share will not prove the existence of monopoly power.").

If, however, the jury defines the relevant markets as the sale of Foley catheters through GPO sales and the sale of intermittent catheters through GPO sales, then there is evidence that Bard possesses market power in both markets. In particular, the record shows that Bard's share of the GPO market for Foley catheters was 89%. See id. (noting that eighty percent can create an inference of market power.). And, although not as significant, Bard's share of the GPO market for intermittent catheters was as high as 67.7%. See id. (citing Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 (5th Cir. 1984), for the proposition that sixty percent may not suffice but it is not legally insufficient).

Bard argues that the evidence of market shares alone is not sufficient to withstand summary judgment. See, e.g., Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 967 (10th Cir. 1990) ("Market share is relevant to the determination of the existence of market or monopoly power, but market share alone is insufficient to establish market power.") (internal quotation omitted). Accordingly, Bard encourages us to consider "other market realities" including "entry barriers" and competition for catheter business to determine whether Bard possesses monopoly power. However, the record is inconclusive as to whether barriers to entry exist and whether Bard had to lower prices to effectively compete for GPO and hospital business. Indeed, Saint Francis presented evidence tending to show that a lengthy and burdensome FDA review process exists as an entry barrier, that a "de minimus" number of new competitors entered the market, and that Bard lowered its prices to foreclose others from getting business. Accordingly, there is, in my view, a genuine issue of fact as to whether Bard possesses market power.

### b.     Anticompetitive Conduct

Saint Francis argues that Bard's GPO contracts were anticompetitive because they (1) were exclusive or semi-exclusive dealing arrangements; (2) included market-share discounts; and (3) included bundled discounts and rebates.  The district court rejected Saint Francis's arguments and held that the conduct which Bard participated in was not anticompetitive as a matter of law.  Again, I believe there are questions of fact on these issues.

"Because cutting prices in order to increase business often is the very essence of competition, . . . it 'is beyond the practical ability of a judicial tribunal to control [above cost discounting] without courting intolerable risks of chilling legitimate price cutting.'" Concord Boat, 207 F.3d at 1061 (alteration in original) (quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223 (1993)).  Thus, "[i]f a firm has discounted prices to a level that remains above the firm's average variable cost, 'the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive.'" Id. (quoting Morgan v. Ponder, 892 F.2d 1355, 1358 (8th Cir. 1989)).  This court's decision in Concord Boat is instructive on this issue.

In Concord Boat, we held that because the defendant's discount programs (1) were not exclusive dealing contracts; (2) did not require the customers to purchase 100% from the defendants; and (3) did not bundle or tie multiple products together, the discount programs were not anticompetitive. Id. at 1062-63. Unlike the discounts in Concord Boat, Saint Francis has here presented evidence tending to show that Bard's GPO discount pricing schemes bundled discounts by linking monopolistic products with another competitive product.  As noted in Concord Boat, such bundled discounts may constitute anticompetitive conduct. Id. at 1062 (collecting cases). Additionally, Saint Francis has also presented evidence showing that Bard's GPO contracts were at least semi-exclusive if not completely exclusive.  Moreover, while

the evidence shows that hospitals did not feel compelled to buy 100% of their requirements from Bard, Saint Francis also presented evidence showing that the GPO contracts forced hospitals to buy a large percentage of their needs from Bard. And, evidence also indicates that Bard's competitors would have to offer a product at far below cost in order to compete with Bard's tiered-pricing scheme. Finally, Saint Francis stated that Bard's GPO discounts coupled with its sole-source and dual-source agreements effectively foreclosed competitors from the market. Accordingly, I believe there is at least a question of fact as to whether Bard's bundled and tiered-discount programs were anticompetitive. The district court improperly resolved these factual disputes in favor of Bard.

Finally, Saint Francis's expert concluded that under the attribution test articulated in Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008)[6], Bard's bundled discounts were anticompetitive because the non-catheter products in the bundles were priced below cost. Under Cascade, an anticompetitive bundle is one that prevents a rival from earning a profit on the product bundled with the product that is allegedly monopolized. Id. at 906-07. Bard argues that the expert incorrectly applied the test. To be sure, we should reject an expert opinion "when indisputable record facts contradict or otherwise render the opinion unreasonable." Concord Boat, 207 F.3d at 1057 (quotation omitted). And, here, the undisputed evidence showed that (1) hospitals did not believe they were prevented from buying off-contract; (2) 30-40% of all catheters are sold outside of GPO contracts; and (3) between 34 and 71% of catheters sold on GPO contracts are not sold at the highest price tier. But, there is also evidence supporting Saint Francis's expert. Indeed, Bard's own documents show that a hospital must comply with GPO requirements or lose the discounts. Such requirements include mandating that GPO members look first to the GPO contract for their needs or risk losing the bundled and tiered discounts. Accordingly, this

[6]It is uncertain whether our circuit would adopt the test set forth in this case, but it presents a possible legal and factual rationale for how bundled discounts work to foreclose the market.

-26-

evidentiary dispute presents a question of fact as to whether the contracts were anticompetitive.

## 2. Antitrust Injury

Where private plaintiffs bring an antitrust action, it is not sufficient for them to merely show that the defendants engaged in anticompetitive conduct. Instead "a private plaintiff must [also] demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that he has standing to pursue a claim under the federal antitrust laws." In re Canadian Import Antitrust Litig., 470 F.3d 785, 791 (8th Cir. 2006). The district court concluded that Saint Francis had not presented any evidence establishing that they were injured by any of Bard's alleged anticompetitive conduct. I disagree.

An antitrust injury is an "injury of the type that antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Here Saint Francis presented evidence showing that but for Bard's exclusionary conduct, catheter prices would have been approximately 40% lower than the average price paid by Bard's customers. Additionally, Saint Francis presented evidence showing that certain penalties Bard charged hospitals defecting from their GPO purchasing obligations caused hospitals to continue to buy Bard catheters at a higher price. Such evidence of having to pay a higher price for a product is "assuredly one type of [antitrust] injury." Blue Shield of Virginia v. McCready, 457 U.S. 465, 482 (1982).

Notably, there is evidence in the record indicating that Saint Francis continues to buy Bard catheters, although Tyco's are lower in price, because that is what its physicians want. However, whether Saint Francis actually purchases such catheters as a matter of preference or because of Bard's anticompetitive conduct is, in this case, a question of fact.

-27-

## C. Section 3 of the Clayton Act

Saint Francis also alleged that Bard violated Section 3 of the Clayton Act. Section 3 of the Clayton Act prohibits the offering of a "discount . . . or rebate . . . on the condition, agreement, or understanding that the . . . purchaser . . . shall not use or deal in the goods . . . of a competitor." 15 U.S.C. § 14. "Contracts imposing an obligation on a distributor to deal only in the goods of a single supplier will violate Section 3 when 'performance of the contract will foreclose competition in a substantial share of the line of commerce affected. . . . That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited. . . .'" Ryko Mfg. Co., 823 F.2d at 1233 (omissions in original) (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28 (1961). Since Saint Francis has presented evidence showing that the discounts that Bard offered impaired the ability of its competitors to enter the GPO market, and that the discounts encouraged the GPO to only deal in Bard's goods, Saint Francis has presented enough evidence to survive summary judgment on this count as well.

## III. CONCLUSION

This case comes to us after the district court granted summary judgment. Since there are genuine issues of material fact regarding (1) the scope of the relevant product market; (2) the extent of Bard's market power; and (3) the extent of Bard's anticompetitive conduct, I would reverse and remand.

_____